## STATE v. MARK C. CARL.

246 N. W. 2d 192.

October 1, 1976—No. 45596.

*C. Paul Jones,* State Public Defender, and *Rosalie E. Wahl,* Special Assistant State Public Defender, for appellant.

*Warren Spannaus,* Attorney General, *Thomas H. Jensen, Thomas J. Foley,* and *Joseph B. Marshall,* Special Assistant Attorneys General, and *W. R. Glaeser,* County Attorney, for respondent.

Heard before Rogosheske, Kelly, and Scott, JJ., and considered and decided by the court en banc.

ROGOSHESKE, JUSTICE.

Defendant, Mark C. Carl, appeals from a judgment of conviction of aggravated robbery,[1] aggravated assault,[2] and kidnapping[3] in accordance with jury verdicts finding him guilty of those crimes. We find his claims of violations of his Fifth Amendment rights by impermissible interrogation after a Miranda warning, violation of his Fourth Amendment rights by unreasonable search of the trunk of his automobile, and prejudicial reception of prosecution testimony requiring a mistrial to be unsupported in fact and law, and affirm.

On August 28, 1973, at approximately 7:45 p. m., Todd Warner and Harvey Brower met defendant outside of his apartment in the village of Jonathan. They had previously made arrangements with defendant to purchase 20 pounds of hashish for a price of $15,200. There in fact was no hashish, and the entire transaction had been set up by defendant in order to recover approximately $18,000 allegedly owed to him by Todd Warner and others for drugs sold by defendant. After Warner and Brower entered defendant's apartment, two men appeared and one pointed a rifle at them. Brower was forced to turn over the money to the two men, who then threw the money to defendant. Defendant then

---

[1] Minn. St. 609.245.

[2] § 609.225.

[3] § 609.25, subd. 1.

gave approximately $2,000 of this money to his accomplices for their assistance. Thereafter, Warner and Brower were ordered to lie on the floor and they were bound together and sprayed with a chemical substance, possibly chloroform. Defendant and his two accomplices left the apartment. Warner and Brower broke their bonds almost immediately and also left.

At approximately 8 p. m., defendant's son, Miles, was abducted from the Carl family car while it was being loaded in the parking lot of a motel in the city of Bloomington. At approximately 8:40 p. m., defendant's wife telephoned the police to report the abduction. Bloomington Police Officers John Carlson, Thomas Sweeney, and Douglas McComb arrived at the motel between 8:40 and 9 p. m. and met defendant and his wife in their room.

Officer McComb remained in the motel room with Mrs. Carl while Officers Sweeney and Carlson went with defendant to his automobile, from which the abduction had occurred and which was located in the parking lot of an adjacent restaurant. The officers examined the vehicle and requested that defendant open the trunk. Defendant was initially hesitant but then agreed to open the trunk, wherein the officers observed two large stacks of money. Defendant, after indicating it was approximately $13,000, complied with the officers' request to remove the money and accompany them back to the motel room.

In the motel room, Officer McComb gave defendant a precautionary Miranda warning because of the "circumstances surrounding the original call" and the "large sum of money being involved." Defendant, who was counting the money on his bed, responded by saying, "Don't bother me." Officer McComb attempted to speak with defendant's wife concerning the disappearance of their child, but defendant told his wife not to tell the police anything, claiming that he could "handle this." Officer McComb remained in the motel room to continue his investigation. At approximately 11 p. m., defendant received the first call concerning his child's disappearance. This was followed by approximately two or three additional threatening calls between

11 p. m. and 1 a. m. Officer McComb, during the course of these calls, encouraged defendant to inform him of the circumstances surrounding his child's disappearance, to no avail. Between 11:45 p. m. and 12:15 a. m., defendant received a call regarding the events which had transpired at the drug "ripoff" and threatening that he should return the money if he wanted to see his child again. Officer McComb advised Mrs. Carl that in the interest of her child the officers should be informed of the total circumstances surrounding his disappearance. Mrs. Carl discussed the matter with defendant for 5 to 10 minutes. Defendant then approached Officer McComb and told him that he would like to give him some information in the event that something should happen to his child. Prior to this conversation, defendant was again given a Miranda warning. Defendant then told Officer McComb of his participation in the robbery of Warner and Brower and the disappearance of his child shortly thereafter.

At approximately 4 a. m., defendant's child was recovered and brought to the motel. Defendant was arrested because of an outstanding warrant arising out of a different incident.

The next day, at approximately 3:15 p. m., Detective Ronald Swanson took a written statement from defendant describing the robbery of Warner and Brower. Prior to giving the statement, defendant was again advised of his Miranda rights and waived them.

Defendant contends that it was error to admit into evidence his oral statement the night of his son's kidnapping and his written statement the next day recounting his participation in the robbery of Warner and Brower because these statements were obtained in violation of the standards set forth in Miranda v. Arizona, 384 U. S. 436, 86 S. Ct. 1602, 16 L. ed. 2d 694 (1966). Specifically, defendant argues that upon being initially given a Miranda warning in the motel room he replied, "Don't bother me," and told his wife to remain silent. This, it is asserted, constituted a clear indication of defendant's desire to remain silent and required that the police discontinue any further attempts

to question him or obtain a Miranda waiver. In Miranda, the Supreme Court stated (384 U. S. 473, 86 S. Ct. 1627, 16 L. ed. 2d 723):

"Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, *the interrogation must cease.* * * * [A]ny statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise." (Italics supplied.)

The state contends that it was not improper for the investigating officers to resume questioning defendant and his wife about the circumstances surrounding the kidnapping of Miles Carl because (1) when defendant initially declined to be questioned by the police he was merely being interviewed as a witness to his son's kidnapping and not as a suspect in custody; and (2) that in any event the police were entitled to resume questioning defendant in a noncoercive manner when, as the long night wore on, the circumstances surrounding his son's abduction became more threatening.

The Fifth Amendment privilege against self-incrimination as defined by the United States Supreme Court in Miranda forbids the prosecution from using statements made by the defendant during custodial interrogation unless the prosecution demonstrates that the defendant was properly advised of certain specific constitutional rights. Custodial interrogation was defined in Miranda as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U. S. 444, 86 S. Ct. 1612, 16 L. ed. 2d 706. In State v. Raymond, 305 Minn. 160, 232 N. W. 2d 879 (1975), we held that the Miranda warnings must also be given to individuals in cases where police-initiated questioning has focused on the person questioned as being involved in a particular crime.

When the police officers in this case returned from the park-

ing lot to the motel room with defendant and the $13,000 in cash, they advised him of his Miranda rights before questioning him further about the source of the money and the circumstances of his child's abduction. This Miranda warning was not constitutionally required because defendant at this time was neither in custody nor suspected of having committed a particular crime. Cf. State v. Thompson, 273 Minn. 1, 139 N. W. 2d 490 (1966). Presumably, the officers gave defendant a Miranda warning out of an abundance of caution. The officers testified that defendant was free to leave the motel room at this time with the money, had not been arrested, and was otherwise under no custodial restraints. Cf. State v. Hobson, 309 Minn. 411, 244 N. W. 2d 654 (1976). Defendant's refusal to cooperate with the police at that point amounted to no more than a potential witness' voluntary choice not to disclose all relevant facts known by him. Such testimonial conduct could not at that time be assessed by the officer as defendant's assertion of his Fifth Amendment right to remain silent.

When the threatening calls began, the police learned that Todd Warner was one of the abductors and came to suspect that defendant's son's life was in danger due to yet undisclosed events which had occurred earlier that evening. After giving the appropriate Miranda warnings, the police again asked defendant and his wife to cooperate in the investigation of their son's kidnapping, which they jointly agreed to do. In our view, defendant's subsequent inculpatory oral statement was clearly voluntary and not in any way the product of police coercion or force. While the fact his son's life was in jeopardy was no doubt a strong inducement to defendant to speak, the police themselves did nothing to coerce defendant to talk but rather acted with scrupulous concern for defendant's rights.

Since we are persuaded that defendant's oral statement was voluntary and admissible and not the result of a resumption of custodial interrogation after defendant had initially exercised his privilege as a criminal suspect to remain silent, no proper

purpose would be served by a discussion of the arguable application of the recent decision of the United States Supreme Court in Michigan v. Mosley, 423 U. S. 96, 96 S. Ct. 321, 46 L. ed. 2d 313 (1975), or our decision in State v. O'Neill, 299 Minn. 60, 216 N. W. 2d 822 (1974). Cf. Massimo v. United States, 463 F. 2d 1171 (2 Cir. 1972), certiorari denied, 409 U. S. 1117, 93 S. Ct. 920, 34 L. ed. 2d 700 (1973); United States v. Olof, 527 F. 2d 752 (9 Cir. 1975); A. L. I., A Model Code of Pre-Arraignment Procedure (Proposed Official Draft, 1975), § 140.8, Commentary, p. 370. We simply do not factually view this as a case involving a resumption of custodial interrogation.

Defendant's contention that his written inculpatory statement the day after his son's abduction should have been barred as derivative from his allegedly coerced oral statement, Wong Sun v. United States, 371 U. S. 471, 83 S. Ct. 407, 9 L. ed. 2d 441 (1963), is without substance in view of our conclusion that the oral statement was voluntary and not the result of improper interrogation after defendant had invoked his right to remain silent.

At trial, Officer McComb testified that shortly after returning with defendant to the motel room from the parking lot, where the presence of the $13,000 in defendant's car trunk was revealed, he gave defendant a Miranda warning and received the reply, "Don't bother me." Defense counsel moved for a mistrial at this point, claiming that the admission of the Miranda warning followed by testimony about defendant's refusal to cooperate raised the impermissible inference to the jury that defendant was silent because he was guilty. While testimony about Miranda warnings is generally impermissible for the reasons asserted by defendant, State v. Beck, 289 Minn. 287, 183 N. W. 2d 781 (1971), we have held that such testimony may be admitted to provide a foundation for the admission of subsequent statements made by the defendant if the testimony is of legitimate probative value in tending to show the voluntariness of the subsequent statement. State v. Combs, 292 Minn. 317, 195 N. W. 2d 176 (1972); State v. Watts, 296 Minn. 354, 208 N. W. 2d 748 (1973).

Although the admission of testimony about the first Miranda warning was not indispensable foundation testimony since testimony was admitted of the second Miranda warning given immediately before the statement, the record indicates that the testimony objected to was intended and received as foundation testimony and not for the purpose or with the effect of implying defendant's guilt from his initial decision not to cooperate. We are therefore persuaded that no prejudice resulted.

After relating the return of the child to defendant, Officer McComb testified that defendant was then arrested. When asked on what charge, he replied: "There was an outstanding warrant as—." Defense counsel immediately objected and moved for a mistrial. The court denied the motion but ordered the jury to disregard the statement.

There is no question but that admission of this reference to defendant's involvement in another crime was improper. The issue is whether this error was so prejudicial that defendant was denied a fair trial. In our view the error was harmless because the jury was instructed to ignore the testimony, the testimony was so brief that the jury learned nothing about the prior crime, and the other testimony in the case so overwhelmingly indicated defendant's guilt that the improper testimony is unlikely to have affected the verdict.

Defendant contends that the search of his trunk wherein $13,000 was found was unreasonable and violated his constitutional rights. At trial, after recounting that defendant initially said "no" when asked if the police could inspect his car trunk, Officer Carlson testified as follows:

"Q. Did you have any further conversation with him at that time?

"A. Yes, I explained to him that we were called to conduct an investigation of an alleged kidnapping, or abduction. I would appreciate his cooperation in all matters regarding the missing child, and again asked him if he would open the trunk of the car.

"Q. What did he say?

"A. He said, 'Oh, okay', and he opened it up.

"Q. How did he open the trunk?

"A. He got the keys out of his pocket and opened the trunk."

The above testimony amply demonstrates that there existed a sufficient factual basis from which the trial court could reasonably have concluded that defendant freely and voluntarily consented to this search. The trial court did not err in admitting into evidence the money found as a result of this lawful search.

Affirmed.